**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

DAVID McARTHUR,

                        Plaintiff,

     v.                                    No. 06-CV-860
                                        (LEK/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
_____

**APPEARANCES:**                      **OF COUNSEL:**

LACHMAN & GORTON            PETER A. GORTON, ESQ.
Attorney for Plaintiff
Post Office Box 89
1500 East Main Street
Endicott, New York 13761-0089

HON. ANDREW T. BAXTER       DENNIS J. CANNING, ESQ
United States Attorney for the      Special Assistant U.S. Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**


### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff Daniel McArthur ("McArthur") brought this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

McArthur moves for a finding of disability and the Commissioner cross-moves for a

_____

     [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Docket Nos. 10, 11.  For the reasons which follow, it is

recommended that the Commissioner's decision be reversed.


## I. Procedural History

On November 10, 2004, McArthur filed an application for disability insurance

benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 55-61.[2]  That

application was denied on January 18, 2005.  T. 26-29.  McArthur requested a hearing

before an administrative law judge ("ALJ"), which was held before ALJ Thomas Zolezzi on

August 25, 2005.  T. 33, 229-76.  In a decision dated September 23, 2005, the ALJ held

that McArthur was not entitled to disability benefits.  T. 11-24.  On October 3, 2005,

McArthur filed a request for review with the Appeals Council.  T. 9-10.  The Appeals

Council denied McArthur's request for review on June 30, 2006, thus making the ALJ's

findings the final decision of the Commissioner.  T. 5-8.  This action followed.


## II. Contentions

McArthur contends that the ALJ erred when he failed to (a) consider sworn lay

testimony, (b) credit properly McArthur's subjective complaints of pain, (c) credit properly

the opinions of McArthur's treating physicians, and (d) find that McArthur could not

continue to work in a sedentary position.  The Commissioner contends that there was

substantial evidence to support the determination that Anderson was not disabled.

---

[2] "T." followed by a number refers to the pages of the administrative transcript
filed by the Commissioner.  Docket No. 3.

### III. Facts

McArthur is currently fifty-one years old and has an associates degree in land surveying and civil engineering.  T. 233-34.  For the last twenty-one years, McArthur worked in the construction industry, acting as owner and operator of a mechanical insulation company since 1992.  T. 143, 237.  McArthur alleges that he became disabled on April 1, 2004 from arthritis and vertigo  T. 14, 16.

### IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.   Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. -4 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing

Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry, 675 F.2d at 467. Substantial evidence is "more than a mere scintilla,"

4

meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

### A. Medical Evidence

Because McArthur's condition is centrally at issue here, the medical evidence of that condition is described in detail.

### 1. Dr. Cooke

McArthur was treated by his primary physician, Dr. Randolph Cooke, for pneumonia and a chronic cough from March until June, 2003.  T. 106-108.  On December 15, 2003, McArthur complained to Cooke of chest and shoulder pains which he believed were

related to anxiety.  T. 109.  The pain radiated down both shoulders, McArthur experienced

nausea but no vomiting, and he stated that this had never happened to him before.  Id.  A

stress test was ordered.  Id.  A week later, McArthur underwent a stress test which was

negative.  Id.  The following day, McArthur reported that the chest pains had continued

and were becoming more frequent, especially in the morning.  Id.  Additionally, McArthur

experienced increased nausea with the more severe episodes but had not yet vomited.  T.

110.  Dr. Cooke diagnosed McArthur with probable gallbladder disease and placed him on

a strict diet.  Id.  A subsequent abdominal ultrasound was normal.  Id.

On January 20, 2004, McArthur reported that his chest pains had decreased in

severity, lasted between twenty minutes and two hours, primarily occurred in the morning

or evening, and resulted in lightheadedness.  Id.  McArthur appeared normal, his cardiac

and gastrointestinal tests were all negative, and his chest pains were most likely the result

of anxiety.  Id.  McArthur was prescribed anti-anxiety medication.  T. 171.

On February 10, 2004, McArthur stated that "[h]e has noticed significant

improvement in his overall feeling of well-being with the [prescription medication]."  T. 111.

Additionally. McArthur's concentration had improved, he was having fewer episodes of

chest discomfort, and he was sleeping well.  Id.  Dr. Cooke confirmed that the initial

diagnosis of generalized anxiety disorder which had improved with medication.  Id.

Additionally, McArthur had a benign lesion removed from his shoulder.  Id.  Two weeks

later, McArthur's sutures were removed from his shoulder.  Id.  McArthur complained of

increasing problems with his knees, stating that he had surgery on both knees over fifteen

years earlier by Dr. Van Gorder.  Id.  McArthur had a normal physical examination and

was advised to contact Dr. Van Gorder concerning his knee pain.  Id.

6

For the next five months, McArthur received treatment for plantar warts.  T. 111-13. Additionally, in July 2004, McArthur stated that he felt much better, was not as depressed as he previously was, and that although he was still having panic attacks, they were not as severe as they previously were.  T. 112.  McArthur had been advising his church in the renovation of a building and was noted to be in no acute distress.  Id.

On August 30, 2004, Dr. Cooke was asked to provide paperwork pertaining to the current status of McArthur's knees post-bilateral knee arthroscopy.[3]  Id.  McArthur reported that at the time of the surgery, he was informed that he would be a candidate for a total knee replacement.  Id.  The pain in his knees had gotten progressively worse over the prior two years and he currently required a cane to ambulate as he could not walk without discomfort.  Id.  McArthur reported attempting to find a desk job at Cornell University as he was doing well on his pain medication.  Id.  Dr. Cooke encouraged McArthur to seek (1) employment stating that his "knee osteoarthritis[4] [and d]epression [are] controlled with medication, and (2) an appointment with an orthopedist to evaluate his knees for completion of his disability paperwork.  Id.

On January 10, 2005, Dr. Cooke diagnosed McArthur with possible ankylosing

---

[3] Arthroscopy is the "[e]xamination or surgical repair of the interior of a joint with an arthroscope . . . . [inserted into the body] using small incisions or portals around the joint." ORTHOPAEDIC DICTIONARY 23 <http://books.google.com> [hereinafter ORTHOPAEDIC DICTIONARY].

[4] Osteoarthritis which is a "noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane . . . accompanied by pain . . . and stiffness . . . ."  DORLAND'S ILLUSTRATED MED. DICTIONARY 1199 (28th ed. 1994) [hereinafter "DORLAND'S"].

spondylitis[5] and psoriatic arthritis.  T. 176.  Additionally, a bone scan showed possible

kidney stones or other ureteropelvic obstructions, and a CT scan of the abdomen and

pelvis was ordered.  Id.  The CT scan showed no abnormalities in the kidneys or collecting

systems.  Id.  However, the scan showed "a persistently twisted loop of [the] small bowel"

which would require further follow-up only if McArthur began having abdominal pains.  T.

175, 218.

On January 25, 2005, McArthur saw complained of insomnia.  Id.  Dr. Cooke

opined that the insomnia could be a side effect of the antidepressant and suggested that

McArthur cease taking the antidepressant for a few days to see if the insomnia improved.

Id.  Dr. Cooke recommended that if it did not, McArthur discontinue the pain medication in

a similar fashion or use Benadryl to counteract the insomnia.  Id.

On August 18, 2005, Dr. Cooke noted that "[e]xamination of [McArthur's] neck

reveal[ed] fairly markedly diminished mobility" and he was suffering from persistent

vertigo.  T. 220.  On August 18, 2005, Dr. Cooke completed a medical source statement.

T. 213-16.  Dr. Cook diagnosed McArthur with arthritis of the neck, back, left shoulder,

both knees, and right ankle, citing decreased mobility, crepitus, and swelling as medical

evidence to support the diagnosis.  T. 213.  Additionally, he stated that normal rest periods

provided by an employer for McArthur to lie down would accommodate the number.  Id.

Moreover, Dr. Cooke stated that he would expect that McArthur would be absent more

than three times per month if he were to engage in regular work.  T. 214.  McArthur's

---

[5] Ankylosing spondylitis is "the form of rheumatoid arthritis that affects the spine . . .
producing pain and stiffness as a result of inflammation of the . . . joints."  DORLAND'S
1563.

complaints of pain were moderate to severe, consistent with his diagnosis, and credible. Id.  Dr. Cooke opined that McArthur could sit for four hours in a work day, sit for two hours at a time without interruption, was unable to stand or walk for any amount of time during the workday, could lift one to nine pounds for periods up to three hours per day, was prohibited from climbing, balancing, stooping, crouching, kneeling, or crawling, and would be limited in his ability to reach, handle, push, and pull given his arthritis.  T. 214-15. These conditions had a moderate effect on McArthur's ability to work and severe impacts on his ability to sustain a work space.  T. 215.

### 2. Dr. Van Gorder

On September 22, 2004, Dr. Van Gorder ruled out rheumatologic disorders despite McArthur's symptoms.  T. 114, 174.  McArthur did not report any catching or locking, stated that he was receiving good pain relief, and did not display any swelling, instability or pain.  Id.  Radiology reports demonstrated "very minimal degenerative changes."  Id.  In October, McArthur was evaluated by Cooke for his warts and complained of worsening knee pain.  T. 113, 176.  On October 20, 2004, McArthur returned to Van Gorder with multiple complaints of joint pain in his spine, shoulders, neck, and knees.  Id.  While the laboratory studies had been negative, Dr. Van Gorder recommended x-rays of the cervical spine and shoulder, additional laboratory testing, and a referral to rhuematologists Drs. Dura and Oven for evaluation.  Id. at 114. The radiology results from the cervical spine showed a "slight . . . subluxation[6] of C3 on C4 and C4 on C5 . . . , mild asymmetry of the

---

[6]  Subluxation is "an incomplete or partial dislocation."  DORLAND'S 1596.

spaces between the lateral masses . . ., [and m]ild proliferative changes . . . involving [the] . . . facet joints." T. 115. However, the disk spaces and vertebral bodies were well preserved and the asymmetry was potentially congenital with no known clinical significance. Id. The radiology results for the shoulder were benign. T. 116.

### 3. Dr. Dura

On November 18, 2004, McArthur had a consultation with a rheumatologist, Dr. Paul Dura. T. 117-20, 180-83. McArthur complained of progressive knee pain requiring the use of a cane to ambulate, soreness, stiffness, and decreased range of motion in his neck and left shoulder, and mild insomnia. T. 117, 180. McArthur had been taking prescription pain medication which helped significantly so that he did not require the cane as often and the range of motion in his left shoulder and cervical spine were minimally improved. Id. McArthur was able to climb on and off the examination table without assistance, his cervical spine had full range of motion, his left shoulder had a marked decrease in its range of motion, and his hips and knees had good ranges of motion. T. 118-19, 181-82. Dr. Dura's impression was that McArthur had suffered a significant decrease in the range of motion in his left shoulder and that the back and knee pain has progressively worsened. T. 119, 182. McArthur was instructed to attend physical therapy and continue his prescription pain medication. Id. Additionally, McArthur was scheduled for further testing to determine why there was bone thickening in his shoulder and back. T. 120, 183.

On December 31, 2004, McArthur reported to Dr. Cura that physical therapy and his prescription medication had been improving his pain although he still did not feel

completely normal.  T. 179.  Dr. Dura noted that McArthur still experienced episodes of

anxiety that caused muscle spasms in his neck, utilized a cane to ambulate, and

examination showed a general overall decreased range of motion including in his cervical

spine, shoulders and hips.  Id.  However, Dr. Dura also stated that McArthur seemed

strong, the range of motion in his knees was good although movement was guarded, the

laboratory studies were relatively benign despite some changes in the radiology reports,

and his overall condition was mild.  Id.

On February 21, 2005, Dr. Dura stated that the bone scan completed in January

showed scattered arthritic changes but examination "shows reasonably good flexion,

decreased extension and some straightening of the [cervical spine]," limited range of

motion in the left shoulder, and good movement in the hips, knees and ankles.  T. 178.

Dr. Dura concluded that McArthur was suffering from a degenerative process, there was

no definite activity of inflammatory arthritis such as psoriatic arthritis, although that did not

necessarily negate Dr. Cooke's prior diagnosis, and that McArthur should continue his

current pain medication since he was finding it helpful.  Id.

Three months later, Dr. Dura diagnosed McArthur with cervicalgia,[7] noted a

generalized increase in bone density of an unknown cause, and ordered a metabolic panel

which came back negative.  T. 223.  McArthur's chief complain was again insomnia,

stating that he had recently been sleeping only two nights a week and that this had led to

a more painful disposition.  Id.  Upon examination, McArthur demonstrated good range of

_____

[7] Cervicalgia is "[d]iscomfort or more intense forms of pain that are localized to the cervical region . . . generally refer[ring] to pain in the posterior or lateral regions of the neck."  See http://www.online-medical-dictionary.org/Cervicalgia.asp?q=Cervicalgia

motion and no swelling in his hips, knees, ankles, or shoulders but with a very limited

range of motion in his cervical spine.  Id.  Dr. Dura concluded that "[d]epending on the

situation, we may need to consider more aggressive treatment for [McArhtur's] arthritis,

especially if it becomes inflammatory or looks like psoriatic arthritis."  Id.

On June 28, 2005, McArthur arrived in the emergency room complaining of an

episode of vertigo which was very strong, affected his hearing and sight, caused

numbness in his face across the entire jaw and around the mouth, and resulted in tingling

in his hands.  T. 205.  McArthur did not (1) hyperventilate or lose consciousness, (2) have

difficulty seeing or hearing, describing the dizziness as more of a strobe-like effect, or (3)

experience overwhelming nausea or diarrhea.  Id.  A CAT scan, EKG, and chest x-ray

were all normal.  T. 206.  The impression was benign positional-type vertigo and McArthur

was instructed to take medication, increase his fluid intake, and follow up with his primary

care physician.  Id.  On July 14, 2005, Dr. Dura confirmed his prior diagnosis of cervicalgia

and osteoarthritis, noted a decreased range of motion in the cervical spine and shoulders,

and concluded that McArthur's clinical status had improved as far as his arthritis was

concerned but had deteriorated with the increased episodes of vertigo.  T. 222.  McArthur

had been attempting to treat the vertigo with dried cherries.  Id.

On August 22, 2005, Dr. Dura, like Dr. Cooke, found "that [McArthur] requires

complete freedom to rest frequently without restrictions," he needs to "lie down substantial

periods of time during the day," the medical condition would result in excessive

absenteeism, namely  more than three days per month, and that he is, at times, in

moderate to severe pain.  T. 210.  Additionally, Dr. Dura concluded that McArthur should

only lift less than ten pounds for no more than three hours per day and that the pace of his

12

work could be severely impacted by his medical conditions.  T. 211.

### 4. Dr. Henderson

On December 17, 2004, McArthur underwent an orthopedic evaluation by Dr. Mark Henderson.  T. 137-41.  Dr. Henderson noted that McArthur had undergone knee surgery, recently complained of significantly increased pain in both knees and left shoulder, x-rays indicated degenerative joint disease in both knees and an arthritic condition in his back with potential spondylosis.[8]  T. 137.  McArthur used a cane, could not stand for a prolonged period of time, walk, or bend, took prescription pain medication, and attended physical therapy.  Id.  McArthur was also treated for anxiety.  T. 138.  McArthur stated that his daily activities included occasional light cooking and self-care.  Id.  His children and wife were responsible for the cleaning, laundry, shopping, and the bulk of the cooking.  Id. McArthur's gait exhibited a significant left limp and stiff knee, he was unable to squat on his left knee and did most of his weight-bearing with his right side, and used the cane to steady himself and improve his ambulation.  T. 139.  McArthur was able to climb on the examination table and dress, but he required assistance rising from the chair, pushing off from the table top, and dismounting the examination table.  Id.  Additionally, Dr. Henderson noted a significantly decreased range of motion in the left shoulder, a decreased range of motion in the left hip and knee, and slight swelling and bony thickening of the left knee with no evidence of instability.  T. 139-40.

Dr. Henderson diagnosed McArthur with psoriatic arthritis and degenerative joint

---

[8] Spondylosis is "a general term for degenerative changes due to osteoarthritis." DORLAND'S 1564.

disease based upon the decreased range of motion in his left shoulder, knee, and hip as well as the decreased strength in his left knee.  T. 140.  Dr. Henderson noted that McArthur had a significantly decreased range of motion in his cervical spine which could evolve into degenerative disc disease.  Id.  Dr. Henderson stated that the prognosis was guarded and that McArthur was "markedly restricted from squatting and kneeling . . ., moderate[ly] restrict[ed] from prolonged standing, prolonged walking, . . . overhead reaching and pushing and pulling . . . ."  T. 140.

### 5. Dr. Aldrich

On December 17, 2004, McArthur underwent another x-ray of his left knee which was unremarkable.  T. 142.  The same day, he underwent a psychiatric evaluation by Dr. Carlton Aldrich.  T. 143-48.   McArthur reported that he had never received any inpatient or outpatient mental health services, he had major arthritis in his spine, knees and shoulders resulting in frequent pain, he was taking two prescription pain killers, and he was suffering from insomnia and a decreased appetite.  T. 144.  McArthur's gait showed a slight limp but his posture and motor skills were normal.  T. 145.  His cognitive function was average to above average and his insight and judgment were both good.  Id.

McArthur stated that (1) he was able to dress, bathe, and groom himself independently although he had difficulty putting on tight clothing and fastening buckles, (2) he occasionally cooked but could not stand for a prolonged period of time, (3) he attempted to help with light housework but was unable to twist, bend, or lift heavy objects, (4) he did a little laundry, (5) he could drive short distances but his back would stiffen and cause pain whenever he was seated for an extended periods, and (6) his daily routine

included waking, taking the dog for a brief walk, listening to the radio, reading, and returning to bed.  T. 146.  Dr. Aldrich concluded that there was no indication of "any major psychiatric condition . . . which would be significantly intense in and of itself to interfere with [McArthur's] ability to function on a daily basis."  T. 147.  Instead, the major limitation appeared physical but "commentary on those conditions is best provided by a medical specialist."  Id.  Dr. Aldrich recommended that McArthur continue to receive medical follow-up and treatment, consider a thyroid gland work-up, and consult a neurologist for issues pertaining to his facial numbness.  Id.

### Disability Analyst

On December 27, 2004, disability analyst P. Belardinelli completed a physical residual functional capacity ("RFC") assessment.  T. 149-55.  McArthur was able to lift less than ten pounds frequently, stand or walk for approximately six hours in an eight-hour work day, sit for six hours in an eight-hour work day, and push and pull without limitation. T. 150.  These conclusions were based on the radiology reports and physical consultant's report.  Id.  Additionally, the analyst stated that "[p]ain and discomfort reduce [McArthur's] physical exertional abilities."  T. 151.  The analyst concluded that McArthur could occasionally climb, balance, stoop, kneel, crouch, and crawl since "some postures may exacerbate [McArthur's] knee and shoulder conditions and cause increased discomfort." Id.  Additionally, McArthur was limited in reaching in all directions due to the decreased range of motion in his left shoulder, but he suffered from no visual, communicative, or environmental limitations.  T. 151-52.  Belardinelli concluded that McArthur's contentions

were consistent with the medical record, McArthur had difficulty bending and participated in limited household activities due to his discomfort, the pain associated with prolonged sitting and standing limited McArthur's ability to do any activities requiring sitting or standing, McArthur was irritable due to his chronic pain, and he could only engage in sedentary work.  T. 153.

### 7. Dr. Apacible

On January 5, 2005, McArthur underwent a bone scan which showed arthritic changes in his shoulders and surrounding joints, cervical spine, and left hip.  T. 226.  Two weeks later, Dr. M. Apacible conducted a psychiatric review concluding that McArthur was suffering from both affective- and anxiety-related disorders but that neither precisely satisfied the statutory diagnostic criteria outlined in the evaluation.  T. 155, 158, 160.  Dr. Apacible concluded that he was mildly limited in performing daily activities and moderately limited in maintaining his concentration, persistence, and pace.  T. 165.  In a subsequent mental RFC, Dr. Apacible found that McArthur would be (1) moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and work in close proximity to others, (2) moderately limited in his ability to complete a normal workday and work week without interruptions from mentally-based symptoms, (3) capable of performing his activities of daily living if his physical pain did not prevent him from doing so, and (4) not disabled since he could carry out unskilled entry-level work.  T. 169-72.

### 8. Administrative Hearing Testimony

Four days later, McArthur, his wife Anna McArthur, his friend David Talcott, and a vocational expert testified at his administrative hearing.  T. 229-76.  McArthur testified that on a good day, he could stand for an hour and walk approximately ten minutes before his back became sore and he needed to sit or sleep for forty-five minutes to two hours to recuperate.  T. 241.  If McArthur sat for more than a few hours, he had to lie down to rest his back.  T. 242.  Additionally, he could not kneel or squat, lift his left arm above his shoulder, carry the groceries, do the laundry, help change the bed, climb the stairs to his bedroom, go hunting, or do any outdoor gardening or other yard work .  T. 242, 244-45, 248.  Because it was too painful for McArthur to climb the stairs to his bedroom, he slept downstairs on a couch.  T. 245.

McArthur testified that he began his days by soaking in a hot tub to loosen his muscles and joints.  T. 245, 249.  McArthur still attempted to help with grocery shopping, light cooking duties, and household chores.  T. 244-45.  However, it took four to five times longer to do household chores as he was required to rest and occasionally return to the hot tub for an additional soak.  T. 244-45, 255-56.  McArthur was still very active in his church, but his physical ailments had caused him to (1) miss one-third of the time he previously spent in services, proselytizing, and providing religious counsel, (2) cease giving Bible study and counseling sessions since his medication caused his mind to cloud, and (3) participate only in religious activities on his good days because on his bad days, he was confined to bed for fourteen to sixteen hours during the day.  T. 246-48, 251-53. McArthur stated that he could not work an eight-hour work day as even on good days, he still needed to spend three to four hours lying down, his medication made him drowsy and

17

unable to concentrate, and his work pace was greatly diminished.  T. 254-55.

Anna McArthur testified that on a bad day, McArthur could not get out of bed.  T. 258.  Bad days happened several days per week.  T. 259.  Additionally, she stated that he was always in visible pain, he grimaced and moved much slower, he could not sit or stand very long, walking was difficult, he took many naps, and had developed very poor concentration, becoming unable to focus even on television shows.  Id.  David Talcott, McArthur's friend, confirmed McArthur's testimony regarding his religious devotion and his increased absence and inability to counsel and conduct Bible study due to his pain and decreased capacity to concentrate.  T. 261-62.

The vocational expert testified that McArthur could not perform his past work as a construction worker but that he had acquired transferable skills such as record-keeping, data management, and interacting with individuals at various levels in the business hierarchy.  T. 265-66.  There were jobs requiring such skills available in the regional and national economies, including an information clerk, calculating machine operator, and addresser.  T. 266-68.  However, the vocational expert also testified that if an individual needed more breaks in addition to the morning, lunch, and afternoon breaks afforded by law, that individual's occupational base would be limited.  T. 268-70.  Additionally, absences exceeding three days a month would "significantly erode the job base" as would the inability to maintain concentration and keep up with the work pace.  T. 271-73.

### B. Lay Witness Testimony

In evaluating a claim for disability, an ALJ generally must consider any testimony

18

concerning the claimant's physical ailments and resulting RFC offered by lay witnesses during the administrative hearing.  See 20 C.F.R. §§404.1513(d)-(e); 20 C.F.R. §§416.913(d)-(e); Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006); SSR 96-5p at 5.  "The testimony of lay witnesses may be entitled to great weight if uncontradicted in the record."  Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (citing Maisch v. Heckler, 606 F. Supp. 982, 991 (S.D.N.Y. 1985) (holding that "[a]n ALJ has an obligation to consider more than just objective medical [evidence and when] . . . it is not possible to reach a determination of disability based on expert medical . . . evidence, subjective testimony by lay witnesses may be entitled to great weight if uncontradicted in the record.").

> [W]here the [claimant] alleges pain or other symptoms that are not shown by the medical evidence . . . such as chronic fatigue or pain (which by their very nature do not always produce clinical medical evidence), it is impossible for the court to conclude that lay witness evidence concerning the [claimant's] abilities is necessarily controverted such that it may be properly ignored.

Timmons v. Comm'r of Soc. Sec., 546 F. Supp. 2d 778, 795 (E.D. Cal. 2008).  If an ALJ "fail[s] to acknowledge relevant evidence or to explain its implicit rejection [there] is plain error" which is unacceptable as "the ALJ's determination of [a claimant's] residual functional capacity . . . should be free from error."  Kuleszo, 232 F. Supp. 2d at 57; see also Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (holding that "[l]ay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.") (citations omitted).

During the administrative hearing, both McArthur's wife and long-time friend

testified as to McArthur's increased level of pain and discomfort, inability to continue performing his daily routine, and the decreased concentration and pace with which he performed the few tasks he could still physically manage.  T. 257-62.  However, the ALJ stated only that these individuals provided testimony.  There was no further discussion as to whether their testimony was consistent with the medical record and, if not, good reasons why they were inconsistent.  If such testimony was consistent with the record evidence, the lack of explanation for disregarding it constitutes plain error.

Thus, it must be determined whether the testimony of these witnesses was consistent with the medical records.  The ALJ stated that McArthur's "medically determinable impairments could reasonably be expected to produce the alleged symptoms.  However, [McArthur's] statements concerning the intensity, duration and limiting effects . . . are not entirely credible."  T. 19.  The ALJ pointed inter alia to (1) McArthur's positive response to pain medication, (2) Dr. Dura's conclusions that McArthur's arthritis was improving, (3) benign laboratory studies, (4) recent examinations showing good ranges of motion in the shoulders, elbows, wrists, hips, knees, and ankles, (5) McArthur's ability to continue to complete many of his activities of daily living independently, and (6) McArthur's August 2004 appointment with Dr. Cooke where McArthur stated, and Dr. Cooke did not object to, his intention to seek employment performing a desk job at Cornell University.  T. 20.

While McArthur stated that his pain improved with the prescribed medication, as time progressed (1) he continued always to use a cane to ambulate, (2) he walked with a limp, (3) the range of motion in his back, shoulder, and hip progressively worsened, and (4) both of his primary treating physicians agreed that he was experiencing moderate to

20

severe pain, he needed "complete freedom to rest frequently without restrictions . . . [and]

lie down substantial periods of time during the day," he could not sit for more than four

hours in a work day, and he was unable to stand or walk for any amount of time in a work

day.  T. 112, 119, 138-40, 145, 153, 174, 182, 210-11, 213-16, 223.

Additionally, while the ALJ relies on treatment notes from September 2004

indicating that, with Dr. Cooke's blessing, McArthur was attempting to find a desk job, the

ALJ failed to consider later records from (1) November 2004 detailing the progressive

worsening of the range of motion in his back and shoulder, (2) December 2004 concluding

that McArthur had a guarded prognosis as there was a significant decrease in his range of

motion, he now required assistance to rise from a chair, push off a tabletop, and dismount

the examining table, and had marked restrictions from squatting and kneeling and

moderate restrictions from prolonged standing and walking, (3) February 2005 finding

decreased range of motion in the spine and diagnosing McArthur with degenerative

changes which may be inflammatory arthritis, (4) May 2005 when Dr. Dura stated that

more aggressive treatment might be required for McArthur's arthritis, and (5) August 2005

statements from treating physicians outlining McArthur's RFC.  T. 117-20, 137-41, 178-83,

204-11, 213-16, 223.

Moreover, the ALJ's reasoning that McArthur could still complete his activities of

daily living runs directly contrary to the lay witness testimony, McArthur's testimony, and

the medical records.  The medical records are replete with entries detailing McArhur's

decreased ability to cook, do housework, dress, bathe, participate in religious activities,

and undertake sporting activities and his complete inability to ascend the stairs to his

bedroom.  T. 138, 146, 153, 244-48, 250.

21

Thus, it appears that the lay witness testimony is overwhelmingly supported by the medical record.  Therefore, in the absence of good reasons otherwise, the testimony should have been considered.  As no good reasons were cited by the ALJ or appear from the record, it was plain error to discount the lay witness testimony.

Accordingly, it is recommended that the Commissioner's determination in this regard be reversed.

### C.  Subjective Complaints of Pain

McArthur contends that the ALJ's decision to discredit his subjective complaints of pain was in error. The Commissioner contends that the ALJ properly considered McArthur's complaints.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).  This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (I)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that McArthur 's "medically determinable impairments could reasonably be expected to produce the alleged symptoms.  However, [McArthur's] statements concerning the intensity, duration, and limiting effects . . . are not credible."  T. 19.  As discussed above, the ALJ pointed to McArthur's positive response to his medication, benign examination and radiology reports, diagnosis of only mild osteoarthritis, ability to maintain independently completing his activities of daily living, and attempts to secure work and assist in consulting for the renovation of Kingdom Hall in 2004.  T. 20.

As discussed supra, McArthur's ability to complete his daily activities have declined. McArthur missed one-third of the religious services he previously attended, it took him four to five times longer to complete simple housework, he was unable to lead Bible discussions or counsel other parishioners, he could not climb the stairs in his home to sleep in his own bed and slept on the couch, he could not drive for an extended amount of

24

time, and he needed assistance with his socks, shoes, buckles, and getting out of the tub. T. 235, 242-48, 259, 261-62. Additionally, despite his benign radiology reports, it is well documented that McArthur's range of motion had steadily decreased and he needed a cane to ambulate. Moreover, McArthur testified that on a good day, he could only sit for a few hours before needing to lie down or soak in a hot tub. T. 241-42. On a bad day, which occurred once to three times per week, McArthur spent fourteen to sixteen hours in bed and rarely left the house, much less participated in his normal activities. T. 250-51. The ALJ failed to address these factors in his analysis.

The Commissioner argues that because McArthur still engaged in some religious activity, provided consultation during a church renovation, and occasionally still participated in proselytizing, the ALJ's decision to discredit McArthur's complaints of pain was supported by substantial evidence. Def. Mem. of Law (Docket No. 11) at 19. However, this argument and the ALJ's decision fail to consider the factors stated above, including McArthur's reduced participation in his religious activities and leadership and that the pain still prevented him from presiding over Bible study or conducting counseling sessions even on days when he felt well enough to attend church. While McArthur attempted to remain active in the religious community and use his expertise to help with the church renovation, this falls well short of the ability to supporting sedentary work. See Bromback v. Barnhart, No. 03-CV-4945 (NRB), 2004 WL 1687223, at *7 (S.D.N.Y. July 28, 2004) (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("[D]aily activities may be used to show that a claimant can work, but only insofar as there is evidence that the claimant engaged in the activities for 'sustained periods comparable to those required to hold a[n exertion level] job.'").

25

The ALJ also did not address the side effects attributed to the multiple pain medications which McArthur had been prescribed.  McArthur claimed that these medications caused insomnia and extreme drowsy, causing him to sleep all day, and blurring his vision.  T. 218, 241.  Additionally, McArthur testified that he soaked in a hot tub, reclined to relieve pressure from his joints, ate dried cherries, and underwent physical therapy in attempts to lessen the pain he was feeling.  T. 120, 137, 179, 183, 22, 241-42, 249.  Moreover, as discussed supra, there is extensive lay witness testimony confirming McArthur's complaints of pain and decreased ability to perform daily functions.

Therefore, the Commissioner's determination should be reversed on this ground.

### D. Treating Physician Rule

McArthur contends that the ALJ did not give proper weight to the opinions of Drs. Cooke and Dura.  The Commissioner states that the ALJ properly determined the weight to be given these treating sources.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

The ALJ gave little weight to the August 2004 opinion of Dr. Cooke, which stated that McArthur could perform a task that required minimal walking, climbing, or similar activities.  T. 20.  However, the August 2005 opinion which Dr. Cooke expressed in the medical source statement[9] was given little weight as the ALJ asserted that it was not supported by the medical record since (1) the January 2005 examination did not render any positive findings, (2) the rest of the treatment records reflect treatment for ailments other than those claimed in the disability application, and (3) this opinion is inconsistent with the prior opinion that McArthur could perform a sedentary job.  T. 21.  Additionally, the ALJ similarly discounted Dr. Dura's concurring medical source statement because McArthur's laboratory studies had been benign and McArthur retained good ranges of

---

[9] As discussed supra, Dr. Cooke stated that McArthur could "sit four hours in an eight hour workday with sitting for two hours at one time without interruption . . . could perform no standing or walking . . . could lift up to nine pounds for up to three hours a day [and] . . . should never climb, balance, stoop, crouch, kneel or crawl."  T. 21, 213-16.

motion in his wrists, elbows, hips, knees, and shoulders.  Id.  Dr. Henderson's physical

RFC evaluation was not given great weight as it did not specify specific exertional

limitations.  Id.  Lastly, the state agency consultant's evaluation was not given great weight

as it was not produced by an acceptable medical source.  Id.

Thus, the ALJ primarily relied on Dr. Cooke's opinion which was rendered in 2004,

a year before the submission of the medical source statements.  To discount the two

treating physicians' most recent opinions required the ALJ to provide good reasons.  The

reasons offered by the ALJ here are articulated above but are neither good nor supported

by substantial evidence in the record.  While it is true that in 2004, Dr. Cooke rendered

that opinion, he also provided the medical source statement after treating McArthur for

another twelve months and at least six additional examinations.  Absent good reasons

otherwise, the most recent opinion should accord the most recent and complete opinion

greater weight.

Additionally, while Dr. Henderson did not provide a specific RFC assessment with

regard to the exact amount of time McArthur could sit and stand, Dr. Henderson did find

that McArthur had a guarded prognosis and was "markedly restricted f[rom] squatting and

kneeling [and] . . . moderate[ly] restrict[ed from] prolonged standing, prolonged walking, . .

. overhead reaching and pushing and pulling . . . .".  T. 140.  This evaluation is consistent

with the host of physical limitations articulated in the medical source statements submitted

by both treating physicians.  T. 210-11, 213-16.  The fact that the ALJ regarded this

information as insufficient to determine or evaluate McArthur's RFC is unfounded as the

terms that the Social Security Regulations and Rulings used to explain the requirements of

light and sedentary work do not include such rigid requirements.  See 20 C.F.R.

§404.1567 (a) & (b) (defining sedentary and light work as occupations which "involve[]

sitting [with] a certain amount of walking and standing . . . necessary . . ," and "require[] a

good deal of walking or standing, or . . . , sitting most of the time with some pushing and

pulling of . . . controls," respectively); SSR 83-10 (defining both sedentary[10] and light[11]

work for which a person is able to sit or stand not solely in terms of the amount of hours).

The ALJ also states that the assessments of Drs. Cooke and Dura were neither

well supported by or consistent with substantial evidence in the record.  This assertion is

incorrect.  As discussed supra, while the radiology results were relatively benign, the

record is replete with discussions about McArthur's continually decreasing ranges of

motion, need to use a cane to ambulate, abnormal gait, evidence of arthritic changes, and

complaints of ongoing pain.  T. 117-20, 137-41, 145, 178-83, 204-11, 213-16, 223.

It is noteworthy that some of these treatment records and one of the medical source

statements were completed by a rheumatologist and that the orthopedic evaluation was

completed by an orthopedist, both specialists and both best qualified to assess the

specific physical ailment and accompanying limitations presented here.

Accordingly, the Commissioner's finding in this regard should be reversed.

---

[10] Sedentary work primarily involves sitting "approximately 6 hours of an 8-hour workday"; however, "a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally [no more than about 2 hours of an 8-hour workday] . . . ."  SSR 83-10. Additionally, "[b]y its very nature, work performed primarily in a seated position entails no significant stooping."  Id.

[11] Light work "requires a good deal of walking or standing . . . [or] sitting most of the time but with some pushing and pulling of . . . controls, which require greater exertion than in sedentary work . . . ."  SSR 83-10.

**D. RFC**

McArthur contends that the vocational expert's testimony regarding his RFC and ability to maintain employment is not supported substantial evidence.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

The ALJ determined that McArthur was not capable of performing his past work.  T. 22.  However, the ALJ concluded that McArthur had acquired skills in "record keeping, data management, and [the] ability to deal with contractors" from his prior employment experience.  Id.  The ALJ concluded that McArthur retained the RFC to perform a reduced range of sedentary work.  Id.

At the hearing, the ALJ asked the vocational expert if there was a job suitable for a younger individual with McArthur's education, past work experience and RFC.  The vocational expert testified that McArthur could work as an information clerk, calculating machine operator, addresser, or a telephone quotation clerk.  T. 23, 266-68.  However, the vocational expert also testified that McArthur's occupational base would be significantly eroded if (1) he required additional breaks beyond the three which are generally provided

to employees throughout the day, (2) his ability to sustain a work pace or concentrate was impaired, or (3) he was absent more than three times per month.  T. 268-73.

The ALJ's assessment of McArthur's absenteeism and ability to work uninterrupted are not substantially supported by the record.  As discussed supra in subsection V(C), the ALJ improperly discounted McArthur's credibility.  There was no reason to disbelieve McArthur's testimony that he had, at minimum, one bad day a week for a minimum of four absences per month.  Additionally, there was no reason to discredit McArthur's inability to sit for more than a few hours at a time before requiring a break to lie down or soak in a hot tub and rest.  Thus, McArthur was unemployable according to the vocational expert. Because McArthur had no viable occupational base, the Commissioner failed to meet his burden of proving that a substantial number of jobs exist for him in the national economy.

Accordingly, it is recommended that the Commissioner's determination in this regard be reversed.


### E. Remand or Reversal

A reviewing court has the authority to reverse with or without remand.  42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  Curry, 209 F.3d at 124.  Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, the record is clear regarding McArthur's credibility, treating physicians, and RFC.  Therefore, no purpose would be served by remanding the case for further proceedings and the credible evidence of record

31

compels a finding of disability.  Accordingly, it is recommended that the decision of the Commissioner be reversed and not remanded.

### VI. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the decision denying disability benefits be **REVERSED**, McArthur's motion for a finding of disability (Docket No. 10) be **GRANTED**, and the Commissioner's cross-motion (Docket No. 11) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED: October 14, 2008
      Albany, New York

United States Magistrate Judge